## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## EASTERN DIVISION

JULIANNE D.,[1]

        Plaintiff,

vs.

FRANK BISIGNANO,
Commissioner of Social Security,

        Defendant.

No. 24-CV-1034-LTS-KEM

**REPORT AND
RECOMMENDATION**

---

      Plaintiff Julianne D. seeks judicial review of a final decision of the Commissioner of Social Security denying her applications for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and supplemental security income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. Plaintiff argues that the administrative law judge (ALJ), John P. Mills III, erred by failing to include certain limitations in the residual functional capacity (RFC) caused by Plaintiff's headaches and by relying too heavily on the objective evidence in discounting Plaintiff's subjective complaints of her fibromyalgia symptoms. I recommend **affirming** the ALJ's decision.

## I.     BACKGROUND

      Plaintiff's earnings over the last fifteen years have been inconsistent, amounting to substantial gainful activity some years but not others. AR 352.[2] She reported working

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] "AR" refers to the administrative record filed below (Doc. 9).

many jobs over the years, none for longer than two years, due to life circumstances. AR 550. In 2008, she underwent surgery on her cervical spine, and during the surgery, doctors damaged a major artery in her neck, leaving a lasting impact such as Plaintiff's inability to take NSAIDs.[3] AR 536, 913. She worked as an assistant manager at a thrift shop for a year and a half through February 2017, alternately reporting that she was laid off or resigned because of her physical health problems. AR 486, 550, 835-36.

She first reported fibromyalgia symptoms in March 2018, when she was living in a shelter for domestic violence victims (and it does not appear she was working). AR 486, 548, 834-35, 1429. She ultimately began taking Savella, gabapentin, and Flexeril (a muscle relaxer), which improved her pain (she also trialed diclofenac and Cymbalta, the latter which caused negative side effects). AR 555, 644, 1429. She worked for two days at a candy store but reported quitting due to the toll on her physical health. AR 548, 550. She filed a prior claim for disability in August 2018 based on fibromyalgia. AR 103. She believed she could work a desk job, ultimately obtaining such a job in November 2018, but then one of her sons committed suicide, and she took time off to grieve. AR 548, 1266.

Plaintiff began working full time at a call center in early February 2019. AR 835, 1273. Her prior disability claim was denied at the state agency reconsideration level in mid-February, and she did not appeal further. AR 103. In July 2019, she moved into a two-bedroom apartment as part of a housing assistance program through Opening Doors, the organization that managed the house she had been living at. AR 1284. She continued to work at the call center until December 2020, when she was diagnosed with breast cancer. AR 578, 672. Her employment was terminated when she ran out of FMLA leave (although she hoped she would be rehired when she finished treatment). AR 1250.

---

[3] Nonsteroidal anti-inflammatory drugs (which include aspirin, ibuprofen, and naproxen).

2

In January 2021, Plaintiff underwent a lumpectomy and when cancer remained, a right mastectomy. AR 590, 599. She received chemotherapy from mid-February to late April 2021. AR 1397. Surgery and chemotherapy caused her fibromyalgia symptoms to flare. AR 643-45. Plaintiff spoke with nurse practitioner Gretchen Hong (NP Hong), her primary care provider, about adjusting her medications, but NP Hong advised she should wait until the conclusion of chemotherapy. AR 643-45. Plaintiff began taking tamoxifen, a drug to block estrogen and prevent reoccurring breast cancer, in mid-May 2021. AR 1397. Plaintiff went to twelve physical therapy sessions for pain from late March through early June 2021, before she was discharged as meeting all goals and returning to her prior level of functioning. AR 627-28.

Plaintiff filed the current applications for DI and SSI benefits in June 2021, alleging disability since December 29, 2020, due to "fibromyalgia, spinal stenosis, ruptured disc, [and] scoliosis." AR 94. She posited to her case worker at Opening Doors that she was more likely to be approved for disability because of her cancer diagnosis, and then she could work on her art (she also expressed uncertainty about her ability to work anywhere other than the call center she had been working at before her cancer diagnosis). AR 1251. She submitted a function report to the Social Security Administration in late August 2021 (AR 437-444), completing the paperwork with the assistance of her Opening Doors case worker (AR 1253). Her case worker's notes reflect that although she reported she could not sit, stand, climb stairs, walk, or do anything physical for longer than ten minutes, Plaintiff sat through their entire hour-and-a-half meeting. AR 1253.

Plaintiff had a follow-up appointment with her oncologist in August 2021. AR 925. She reported suffered a skin rash, fatigue, and joint discomfort from the tamoxifen. *Id.* Her doctor discontinued the medication due to its side effects and her low risk of cancer reoccurrence. *Id.* She later reported her muscle and joint discomfort improved significantly once stopping tamoxifen. AR 938.

3

From late August to mid-November 2021, Plaintiff received chiropractic treatment for neck and back pain over the course of 28 visits. AR 846-864, 868-889, 1292-99. When treatment concluded, she rated her pain 3 out of 10 on the pain scale, down from 7 when she first started treatment. *Id.* She also met with her primary care provider in September and late November 2021, who noted good control of her fibromyalgia symptoms on her current regimen and refilled her medications. AR 915-21.

From September to December 2021, Plaintiff worked part time as an assistant at an art studio. AR 50, 486, 1161, 1253. She usually worked only one four- or six-hour shift a week, providing supplies to students and was constantly on her feet. *Id.* She began looking for another job with the help of Iowa Vocational Services in November 2021, noting her body was so worn down after a shift that she had to use a cane. *Id.* She also reported she wasn't needed at the art studio much because classes were often cancelled. AR 1165. When her Opening Doors caseworker suggested she return to working at the call center, Plaintiff rejected that idea because it was a draining environment. AR 1254. Plaintiff also worked to start a business selling her artwork (paintings and crochet projects) with the help of Iowa Vocational Services. AR 1262-64.

In early January 2022, Plaintiff interviewed for a part-time weekend position as house staff at a shelter for pregnant women. AR 1164. She was excited about the opportunity because she could continue to work on her artwork during the week. *Id.* She was offered and accepted the job, but before she could start, she tested positive for COVID (along with other staff at the shelter). AR 1164-65. Plaintiff ended up deciding not to take the position, noting that she preferred a work-from-home job and that her boss had been overbearing while she was sick. AR 1165, 1255.

In February 2022, she complained of double vision to her primary care provider. AR 1148. She also reported numbness in her right cheek; intermittent headaches; swelling in her legs, hands, and feet; low back and right hip pain and related difficulty standing more than fifteen minutes; and shaky and weak legs since undergoing

4

chemotherapy. AR 1148, 1150. Her provider noted weakness could be a side effect of Flexeril and directed her to stop that medication. AR 1151. She also ordered a brain MRI, which was normal. AR 953, 1150. The next month, Plaintiff told Iowa Vocational Services that she did not work on her artwork much in February 2022 due to her health but felt better now and back to her baseline fibromyalgia symptoms. AR 1167. She met with ophthalmology and made an appointment with neurology about her double vision. AR 1210-12, 1287-89. In April 2022, she told Iowa Vocational Services she was suffering double vision and tension headaches and had an appointment with neurology to discuss. AR 1175, 1256-57. She also noted difficulty walking up the stairs carrying laundry and washing clothes in her sink instead. AR 1257. Plaintiff met with neurology in July 2022. AR 1287. She reported that after doing crafts or artwork, she would have double vision that would last a few hours and resolve by the time she woke up the next morning. AR 1288. She denied an accompanying headache but noted she suffered headaches due to neck problems. *Id.* She also reported with exercise or activity, her legs felt shaky and weak, she sweat profusely, and she felt light-headed. *Id.* Neurological findings were normal on objective examination. AR 1287-90. Plaintiff suggested an issue with her adrenal system, and neurology directed she ask her primary care provider for these labs. AR 1287. Neurology ordered labs to test for Grave's disease (these labs do not appear to be in the record), and Plaintiff did not have any further neurology appointments. AR 1238, 1287.

Three days after Plaintiff's neurology appointment, notes from Iowa Vocational Services reflect that Plaintiff reported being extremely sore after taking public transit seven hours round trip to the appointment. AR 1238. She used a cane at the meeting. *Id.* She reported struggling physically to work on her art and difficulty sitting up to paint. *Id.* At follow-ups related to breast cancer, she reported a "'prickly' feeling and pulling sensation to [her] chest with activity and raising [her] right arm," as well as intermittent episodes of dizziness and lightheadedness and hip discomfort. AR 1157, 1400.

July and August 2022 notes from Iowa Vocational Services and Opening Doors reflect that Plaintiff met with NP Hong, who ran cortisol and thyroid labs (which were normal) and discovered an enlarged thyroid on ultrasound (these treatment notes from NP Hong are not in the record). AR 1258, 1360. NP Hong referred Plaintiff to an endocrinologist, who Plaintiff met with on August 12, 2022. AR 1407. Plaintiff continued to report fatigue that she believed was caused by adrenal insufficiency. *Id.* The doctor noted her normal cortisol levels, but because of her concern, agreed to conduct a short Cortrosyn (cosyntropin) stimulation study, which was normal. *Id.*; AR 1405, 1409. The doctor recommended no further endocrine evaluation. AR 1407.

In late August 2022, Plaintiff told Iowa Vocational Services that she had been hired for a part-time remote desk position beginning in October. AR 506-07. She expressed concern that sitting for four hours a day would cause too much discomfort, so Iowa Vocational Services ordered her an electric stand-up desk so she could alternate between sitting and standing as needed, as well as a task chair with a headrest and adjustable arms. *Id.* She reported she had not been working on her artwork much due to her health, although she had been crocheting. *Id.* She said she had been suffering dizzy spells when walking and loss of energy. *Id.*

From September through November 2022, the only treatment notes in the record are for twelve chiropractic treatments from September 21 through November 15. AR 1300-23. At her first visit, Plaintiff reported back pain rated 7 out of 10 on the pain scale and neck pain rated 5 out of 10 on the pain scale, which improved with treatment; at her last visit, she rated her pain 4 out of 10. *Id.* In addition, it appears that some treatment documents are missing from the record, as notes from Opening Doors and Iowa Vocational Services reflect that doctors wanted Plaintiff to undergo a sleep study, cholesterol blood test, and breathing test for her lungs. AR 506, 1361. They also state that Plaintiff met with a cardiologist because of her symptoms of suddenly becoming shaky and sweaty with low blood pressure from simple tasks like getting dressed or doing

6

her makeup. AR 1361-62. The cardiologist noted mild thickening of Plaintiff's heart that was not a concern. *Id.* The cardiologist also ordered a stress test, but Plaintiff's insurance did not approve the test, and the cardiologist ultimately agreed Plaintiff did not need it. *Id.* Notes from Opening Doors also reflect Plaintiff reported canceling a chiropractic appointment during a rainstorm because she was in too much pain to get out of bed; becoming dizzy and tired at times and struggling to go on with the rest of her day; having quite a bit of pain throughout her body; and making money by selling hats, scarfs, and mittens that she had crocheted. AR 1361-62.

Plaintiff started working the remote desk job in mid-October. AR 1361. She reported undergoing two weeks of full-time training (40 hours a week), after which her hours would be reduced to working four hours each weekday morning and more during peak season. *Id.*; AR 506. She told Opening Doors that she had to limit the number of hours she worked so that she earned less than $1,350 a month, otherwise she would not be approved for Social Security disability benefits. AR 1361. In early November, she reported being frustrated that she was only being scheduled to work 4 hours a week, but by later in the month, she underwent additional training and was working 20 hours a week as she had originally planned. AR 1361-62. She noted being in more pain during training due to the long hours sitting. AR 1362. Notes from Iowa Vocational Services and Opening Doors reflect that throughout 2023, Plaintiff routinely complained that she was only scheduled to work 2 to 4 hours a week, although occasionally, she would report more hours (e.g., 14 hours a week), as well as training in which she would work 35 hours in a week. AR 512, 514, 1363-69. She began applying to other remote jobs around May 2023. *Id.*

From December 2022 to early May 2023, the only treatment notes in the record related to follow-up appointments with Plaintiff's cancer providers. In December 2022, Plaintiff reported limited range of motion with her right arm because movement made it feel like the skin was being pulled at the incision scar. AR 1324-25. On objective

examination, her doctor observed limited range of motion with the right arm, particularly with shoulder abduction, as well as tight and tender pectoral muscles. *Id.* Plaintiff did not want to be referred to physical therapy and stated she had recently purchased an exercise bike she could use to exercise her upper body. *Id.* Her doctor also noted she could try some gentle stretching and massage to improve her range of motion. *Id.* In March 2023, she reported continuing to struggle with muscle and nerve pain with no new symptoms. AR 1397. In addition, she told Opening Doors in early May 2023 that her doctor had approved lowering her gabapentin dosage, since it made her feel tired and groggy (this treatment note—likely from NP Hong—is not in the record). AR 1365.

During the first half of 2023, she continued to report symptoms to case workers at Opening Doors or Iowa Vocational Services. She canceled a meeting due to a fibromyalgia pain flare. AR 512, 1363-65. She reported being exhausted after working more hours training at work, causing her to put her painting on hold, while bad weather flared her fibromyalgia pain. *Id.* At a different time, she reported painting more; although it affected her body aches, she was learning how to manage her pain and not overdo it. *Id.* She said she had been biking on her exercise bike five minutes at a time so as not to overexert herself. *Id.* Caseworkers noted she kept her apartment tidy and picked up. *Id.* She requested help picking up food from the food pantry, and she also noted how hard it was for her to get groceries without a car—she either had to pay for a delivery fee she could not afford, or struggle to carry groceries on the bus. *Id.* Opening Doors ultimately funded repairs to her car. *Id.*

Plaintiff established care with a new primary care provider in mid-May 2023. AR 1427-30, 1437-39. She reported suffering body aches from fibromyalgia all over, with pain especially in her toes and hands. *Id.* She said her medications (Savella and gabapentin) helped but caused side effects, particularly fatigue with gabapentin. *Id.* She expressed interest in weaning off her medications and trying a more holistic approach (to include essential oils) and physical therapy. *Id.* She also noted her counselor had

recommended naltrexone. *Id.* The provider observed normal gait and station on objective examination. *Id.* The provider referred Plaintiff to physical therapy and to the Wellness Center gym for patients, indicated the provider would research naltrexone, and recommended acupuncture. *Id.* In early June, Plaintiff attended exercise orientation at the Wellness Center. AR 1424.

The remaining treatment notes in the record consist of 24 physical therapy appointments from mid-June to mid-September 2023, with appointments mostly twice a week. AR 1329-36, 1339-58, 1371-91. At her first visit, she reported low back and hip pain (worse on the right side), stiffness and weakness in her arms, and limited range of motion in her neck causing tension headaches. AR 1372. On objective examination, the provider observed limited range of motion in the neck, limited range of motion in her right arm, deficits in arm and leg strength, and that walking a little over 1,000 feet in 6 minutes left her very fatigued. *Id.* At her second visit, she reported more headaches and neck pain after doing the home exercises, so she had stopped doing them; as well as continued right hip and back pain. AR 1335. The next week, she reported feeling sore but like a good muscle workout, not like increased fibromyalgia pain, although she was still hesitant to work on her neck because of the risk of increased headaches. AR 1333. In early July, she reported deep right hip pain after sitting or standing in one place for too long, improved with physical therapy exercises or walking about fifteen minutes. AR 1329-30. She also reported some discomfort between her shoulder blades and a burning sensation during stretches, which her provider noted was possibly due to muscle fatigue or nerve tension. *Id.* She skipped the next week, and her provider educated her on coming to appointments even on days with a pain flare, since they would adjust exercises to accommodate her pain. AR 1356-57. She reported improved pain and the ability to run errands after receiving neurofeedback at her counseling appointment (these treatment notes are not in the record). AR 1354-55. By early August 2023, she reported feeling better and having more energy from a combination of physical therapy and weekly

9

neurofeedback; she said she had to be careful not to "overdo" it since she felt better, noting that she was able to sit for longer than normal at her computer and that she had been sore after doing too much housework. AR 1346-49; *see also* AR 1367, 1369. After fourteen sessions, objective examination revealed improved (but still limited) range of motion in her arms, improved shoulder strength, improved cervical mobility (with correlated reported improvement in headaches), and continued limited and painful shoulder abduction. AR 1341-42. She had met two of her goals of being able to crochet without burning pain and to walk further distances, although she noted she could only go for walks two to three times a week due to fatigue but would like to walk daily. *Id.* In mid-August, she reported feeling very sore after working for eleven days straight. AR 1390-91. Toward the end of August, she began aquatic therapy once a week (in addition to continuing physical therapy with land exercises once a week). AR 1339. She reported increased soreness in her right arm after spending a lot of time on her computer and crocheting. AR 1380-81. She continued to complain of increased soreness in early September (and at one appointment, a muscle spasm over her right rib), and exercises were adjusted to accommodate her pain. AR 1374-79.

The Social Security Administration denied Plaintiff's disability applications on initial review in September 2021 and on reconsideration in January 2022. AR 92-131. Plaintiff requested further review. The ALJ held a telephone hearing on August 15, 2022 (AR 33-61), and issued his first opinion a few days later (AR 135-147). The Appeals Council granted review in June 2023 and remanded the case back to the ALJ for further consideration. AR 154-58. The ALJ held a second telephone hearing on November 15, 2023, at which Plaintiff and a vocational expert testified. AR 62-91. The ALJ issued a written opinion on December 27, 2023, following the five-step process outlined in the regulations[4] to determine whether Plaintiff was disabled during the relevant time period.

---

[4] "During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets

AR 10-24.  The ALJ found Plaintiff suffered from the severe impairments of "degenerative disc disease of the cervical and thoracic spine status post cervical fusion, myalgia, arthralgia, fibromyalgia, obesity, history of breast cancer status post treatment and mastectomy with residuals, restless leg syndrome, and headaches."  AR 14.  To aid in steps four and five, the ALJ determined Plaintiff's RFC,[5] finding Plaintiff could perform light work with the following additional limitations:

> [T]he claimant can occasionally reach overhead bilaterally.  The claimant can occasionally climb ramps and stairs, balance, stoop, kneel, and crouch. The claimant can never climb ladders, ropes, or scaffolds, or crawl.  The claimant can never work at unprotected heights or around moving mechanical parts.  The claimant can occasionally work in environments with extreme cold and work with vibrations.  The claimant is limited to loud noise levels, and can tolerate occasional exposure to atmospheric conditions.  The claimant can never work in environments with head lights, spotlights, or flashing lights.

AR 18.  The ALJ found Plaintiff could perform her past relevant work as a customer service clerk (as generally and actually performed) and retail sales clerk (as generally performed).  AR 23.  Thus, the ALJ found Plaintiff not disabled from December 29, 2020, through December 27, 2023, the date of the decision.  AR 24.

The Appeals Council denied Plaintiff's request for review on May 22, 2024 (AR 1-3), making the ALJ's decision that Plaintiff was not disabled the final decision of the

---

the criteria of any Social Security . . . listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work."  *Grindley v. Kijakazi*, 9 F.4th 622, 628 (8th Cir. 2021) (quoting *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005)); *see also* **20 C.F.R. §§ 404.1520(a)(4) 416.920(a)(4)**.  The claimant bears the burden of persuasion to prove disability.  *Goff*, 421 F.3d at 790.

[5] RFC means "the most that a claimant can do despite her limitations."  *Sloan v. Saul*, 933 F.3d 946, 949 (8th Cir. 2019).

11

Commissioner.[6] Plaintiff filed a complaint in this court in September 2024 (Docs. 1, 5).[7] The parties briefed the issues (Docs. 14, 20) and the Honorable Leonard Strand, District Judge for the Northern District of Iowa, referred this case to me for a report and recommendation.

## II. DISCUSSION

So long as substantial evidence in the record as a whole supports the ALJ's decision, a reviewing court must affirm.[8] "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."[9] The court "do[es] not reweigh the evidence or review the factual record de novo."[10] If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision."[11]

### A. Headaches

Plaintiff argues that the ALJ inadequately analyzed the RFC limitations caused by her headaches and that she would have missed work or needed additional breaks due to

---

[6] *See* **20 C.F.R. §§ 404.981, 416.1481**.

[7] Per Plaintiff's complaint, the Appeals Council extended Plaintiff's time to file an appeal in federal court on August 19, 2024 (Doc. 5), but this extension does not appear to be in the record. The court need not address the timeliness of Plaintiff's complaint, as the Commissioner does not raise the issue. *See Bowen v. City of New York*, 476 U.S. 467, 478 (1986) ("[T]he 60-day requirement [in 42 U.S.C. § 405(g)] is not jurisdictional, but rather constitutes a period of limitations."); *Gionfriddo v. Comm'r of Soc. Sec.*, 475 F. App'x 732 (11th Cir. 2012) (holding that a court may not dismiss a Social Security complaint sua sponte for untimeliness, as untimeliness is an affirmative defense that may be forfeited by the Commissioner).

[8] *Grindley*, 9 F.4th at 627; *accord* **42 U.S.C. § 405(g)**.

[9] *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).

[10] *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994).

[11] *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

12

headaches. Plaintiff did not mention suffering headaches in her August 2021 function report or request for reconsideration in October 2021. AR 437-444, 450. In February 2022, she told the Social Security Administration she suffered tension headaches "more often than before." AR 455. At the first ALJ hearing in August 2022, she only briefly mentioned headaches: when asked why she was unable to work, she noted that before being diagnosed with cancer, she suffered fibromyalgia and sometimes got "slight headaches with muscle tension in [her] neck," but that since undergoing chemotherapy, her fatigue and fibromyalgia pain had worsened. AR 42. At the November 2023 ALJ hearing, she stated that since the last hearing, she had begun suffering headaches in connection with the increased neck pain that came with going to physical therapy. AR 73. She also said that in the last year, she had begun suffering headaches with storms or changes in barometric pressure. *Id*. She said she normally had headaches four to five times a month, but they had been increasing in frequency, and she had recently had a headache every day for a week. AR 74. She said headaches caused by storms passed within a couple of days when the storm passed. *Id*. Headaches caused by sitting or being on the computer too long could last for days, abating when she took a break from the activity but coming back when she returned; she also said these tension headaches improved when the muscles in her head and neck became less tight, through relaxing, moving around, or use of a heating bad. AR 74-75. She noted during the peak season, she worked a four-hour shift every weekday; and the other eight months of the year, she might work only two to four hours a week. AR 79. She thus explained that she "tough[ed] it out" and mostly did not miss shifts, because it was only "a few hours a week," but that she would miss work with eight-hour shifts. AR 79-80. She said her headaches had been terrible lately and it had been hard to even make it through a four-hour shift. AR 80. She also testified that lately, she had begun suffering pain in her neck and a corresponding headache from sitting at her desk for too long during her four-hour shifts. AR 81. When her attorney asked about breaks, she said that she got a ten-

13

minute break about halfway through a four-hour shift; but that she could set her status as "away" and take a short break of a few minutes if needed, although her employer did not like her doing that. AR 80. She said she had taken an unscheduled break "maybe two or three times . . . lately" for two to three minutes, "not long." AR 81.

The ALJ included headaches as a severe impairment at step two (as well as degenerative disc disease of the cervical spine). AR 14. When evaluating Plaintiff's RFC, the ALJ recognized Plaintiff reported that she was unable to work in part due to headaches and that she suffered headaches four to five times a month lasting a couple of days at a time. AR 18. The ALJ noted Plaintiff began physical therapy for fibromyalgia pain and headaches in June 2023 and made good progress toward her treatment goals. AR 20. The ALJ concluded that "[i]n recognition of her reports of headaches," the ALJ limited Plaintiff to "loud noise levels, . . . occasional exposure to atmospheric conditions," and no work in environments with head lights, spotlights, or flashing lights. AR 18, 21.

Plaintiff argues that the ALJ "barely mentioned headaches" when discussing Plaintiff's RFC. Doc. 14 at 21. Plaintiff argues suffering headaches four to five times a month lasting from a couple of hours to a couple of days (as she testified) supports that she will suffer headaches at work resulting in time off task or absences from work. Plaintiff argues that the ALJ should have "explained how someone with a headache can remain on task and continue working without any restrictions." *Id.* at 22.

Plaintiff charges the ALJ with failing to discuss the evidence of her headaches, but such evidence is limited. Treatment records reflect that Plaintiff complained of neck pain and "some dizziness and headaches" in May 2018, prior to the onset date. AR 533. Fibromyalgia medications improved her neck pain. AR 555. Notes from Opening Doors reflect Plaintiff complained of a migraine after working an eight-hour shift in June 2019 (prior to the onset date). AR 1280. Plaintiff denied suffering headaches at cancer follow-up appointments in February, April, and May 2021 and March 2022. AR 782, 797, 818,

936. In a November 2021 questionnaire for Iowa Vocational Services, she did not check absenteeism as a barrier to employment for her, nor indicate she suffered "frequent headaches." AR 501-02. That same month, at a cancer follow-up appointment, she reported improved muscle and joint discomfort since stopping tamoxifen and no "new headaches." AR 938. In February 2022, Plaintiff complained to her primary care provider of double vision, right facial numbness, and intermittent headaches. AR 1150-51. In April 2022, notes from Iowa Vocational Services reflect that Plaintiff reported suffering tension headaches with changes in weather and storms and that she would be following up with neurology after a normal brain MRI. AR 1175. At her July 2022 neurology appointment, Plaintiff denied suffering headaches with double vision, instead stating she suffered headaches most frequently due to neck problems. AR 1288. In May 2023, she reported "viral [symptoms]" to her primary care provider that included two "days of facial pressure, muscle aches, and headaches," and she was ultimately diagnosed with sinusitis and instructed to treat with nasal irrigation and acetaminophen. AR 1429-30. In June 2023, Plaintiff began physical therapy "[t]o decrease pain and headaches." *See* AR 1334. At her first physical therapy appointment, she reported increased tension headaches and poor neck range of motion due to lack of range of motion in her arms. AR 1372. At her next visit, she reported a flare in headaches and neck pain after completing home exercises for physical therapy, and at her third visit, she was scared to work on her neck because of the headache she had suffered previously. AR 1333-35. In August 2023, after 14 physical therapy sessions, Plaintiff had met her goal of improving her cervical flex and extension "to improve her ability to read and write without headaches," but not her goal of improving her "cervical lateral flex . . . to show progress in cervical [range of motion] and headache frequency." AR 1343. The record does not reflect any additional complaints of headaches.

Treatment notes in the record reflect Plaintiff sought limited treatment for neck pain and headaches. The ALJ recognized treatment notes were "sparse" and generally

reflected Plaintiff's pain symptoms were well controlled with medications. Plaintiff did not often complain of headaches even to social services providers like Iowa Vocational Services or Opening Doors. In addition, Plaintiff testified that she was generally able to work twenty hours a week without missing work or needing unscheduled breaks—even after the onset of increased tension headaches. As discussed further in the next section, the ALJ did not find Plaintiff's testimony of her limitations fully consistent with other evidence of record. AR 19. The evidence here does not support that Plaintiff's headaches are so severe that they preclude functioning at work and would result in unscheduled breaks or absenteeism. The court "review[s] the record to ensure that an ALJ does not disregard evidence or ignore potential limitations, but [the court] does not require an ALJ to mechanically list and reject every possible limitation."[12]

I recommend finding that the ALJ did not err in evaluating Plaintiff's headaches.

### B. Subjective Complaints

When evaluating a claimant's subjective complaints—including pain—the ALJ must consider the factors set forth in *Polaski v. Heckler*: "(1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions."[13] "Other relevant factors include the claimant's relevant work

---

[12] ***McCoy v. Astrue***, 648 F.3d 605, 615 (8th Cir. 2011); *see also* **Social Security Ruling (SSR) 19-4p**, 84 Fed. Reg. 44667, 44671 (Aug. 26, 2019) (guidance from Social Security Administration provides that when evaluating functional limitations from headaches, "[c]onsistency and supportability between reported symptoms and objective medical evidence is key in assessing the RFC").

[13] ***Black v. Apfel***, 143 F.3d 383, 386 (8th Cir. 1998); *accord* **Polaski**, 739 F.2d 1320, 1321-22 (8th Cir. 1984), *vacated*, 476 U.S. 1167 (1986), *reinstated*, 804 F.2d 456 (8th Cir. 1986). The court did not explicitly say that it was reinstating the original *Polaski* opinion, but the Eighth Circuit has recognized that it "effectively reinstat[ed]" *Polaski*. **Jones v. Callahan**, 122 F.3d 1148, 1151 n.3 (8th Cir. 1997).

history and the absence of objective medical evidence to support the complaints."[14] The ALJ may not discredit the claimant's allegations based solely on the absence of objective medical evidence, but the ALJ may rest his credibility finding on "objective medical evidence to the contrary,"[15] or "inconsistencies in the record as a whole."[16] Courts must "defer to an ALJ's credibility finding as long as the 'ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so.'"[17]

Plaintiff argues that the ALJ relied too heavily on objective evidence to discredit her pain complaints related to fibromyalgia. Fibromyalgia "is a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues."[18] Guidance from the Social Security Administration recognizes that "[f]or a person with [fibromyalgia], [the ALJ] will consider a longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'"[19] As with other impairments, for fibromyalgia,

> [i]f objective medical evidence does not substantiate the person's statements about the intensity, persistence, and functionally limiting effects of symptoms, [the Social Security Administration] consider[s] all of the evidence in the case record, including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the

---

[14] *Black*, 143 F.3d at 386.

[15] *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002).

[16] *Brockman v. Sullivan*, 987 F.2d 1344, 1346 (8th Cir. 1993).

[17] *Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (quoting *Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001)).

[18] **SSR 12-2p**, 77 Fed. Reg. 43640, 43641 (July 25, 2012).

[19] *Id.* at 43644.

person's symptoms.[20]

As part of his evaluation of Plaintiff's subjective complaints, the ALJ noted:

> Though [Plaintiff] exhibits decreased range of motion of the right upper extremity and some weakness of the upper and lower extremities, neurological exams have been otherwise benign. She likewise has a normal gait and station and does not require an assistive devi[c]e to ambulate.

AR 21. Plaintiff argues that with this statement, the ALJ discounted her subjective complaints of fibromyalgia pain based solely on the lack of objective medical evidence. Several courts have recognized that "[l]ittle can be gleaned from the fact that [a fibromyalgia claimant's] range of motion and other musculoskeletal and neurological examinations were essentially normal," as that is often "the case with fibromyalgia patients," whose only objective finding may be tenderness.[21]

I agree with the Commissioner that the ALJ considered the objective findings as one piece of evidence among many.[22] The statement relied upon by Plaintiff is part of a larger paragraph finding Plaintiff's subjective complaints not fully supported based on the "sparse" treatment records, nature of the treatment she has received as "conservative

---

[20] *Id.* at 43643.

[21] *See Cline v. Colvin*, 771 F.3d 1098, 1105 (8th Cir. 2014) (Bright, J., dissenting) ("[P]hysical examinations of those with fibromyalgia 'will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions'" (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 108-09 (2d Cir. 2003))); *Miller v. Colvin*, 114 F. Supp. 3d 741, 765-66 (D.S.D. 2015) (noting that "the musculoskeletal and neurological examinations are normal in fibromyalgia patients" and that "trigger points are the only 'objective' signs of fibromyalgia" (cleaned up) (quoting *Johnson v. Astrue*, 597 F.3d 409, 410, 412 (1st Cir. 2009))); *Fickler v. Colvin*, No. 8:11CV440, 2013 WL 1090405, at *22 (D. Neb. Mar. 15, 2013) (noting that "[l]ittle can be gleaned from the fact that [a claimant's] range of motion and other musculoskeletal and neurological examinations were essentially normal," as that "is generally the case with fibromyalgia patients").

[22] I further note the results of objective examinations *were* relevant to the evaluation of Plaintiff's degenerative disc disease.

and routine," and reports that her fibromyalgia pain is controlled with medications.[23]  AR 21.  In addition, the ALJ discussed the treatment records in detail, as well as Plaintiff's significant activities of daily living, which includes part-time work totaling 20 hours a week for a few months of the year.[24]  AR 18-20.

Substantial evidence supports the ALJ's conclusion.  Although the record supports that Plaintiff suffers from fibromyalgia pain, the ALJ could find that pain was not *disabling*.  Plaintiff underwent cancer surgery in January 2021 and chemotherapy from February to April 2021.  She underwent physical therapy and reported a return to her pre-cancer symptoms at discharge in June 2021.  She took tamoxifen, a drug to prevent cancer reoccurrence, from May to August 2021 and reported improved muscle and joint discomfort once it was discontinued.  She attended chiropractic appointments in the fall of 2021, which reduced her pain from a 7 on the pain scale to a 3, and she told her primary care provider at two appointments that her fibromyalgia pain was well controlled and declined to adjust her medications (Savella, gabapentin, and a muscle relaxer, the same medications she had been taking within a short time of diagnosis in 2018).  Although she reported double vision, weakness, and shakiness in February 2022 (impacting her ability to work on her art), she stated she returned to baseline the next month after stopping her muscle relaxer.  In summer 2022, she again reported feeling shaky and light-

---

[23] *See Robinson v. Sullivan*, 956 F.2d 836, 840 (8th Cir. 1992) (holding that ALJ "could conclude that [claimant's] treatment history . . . contradict[ed] his claims of disabling [neck] pain" caused by a workplace accident when the record showed large gaps in time when claimant did not seek treatment for neck pain or complain of neck pain during medical appointments for other ailments; providers "prescribed conservative treatment, including physical therapy, muscle relaxants, heat and sound treatments, and pain relievers," and claimant did not seek "more aggressive treatment"; and claimant reported medications helped pain somewhat but did not take them regularly).

[24] "Significant daily activities may be inconsistent with claims of disabling pain," *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005); but the ALJ must consider the claimant's limitations in performing these activities and their "quality, frequency, and independence," *Reed v. Barnhart*, 399 F.3d 917, 924 (8th Cir. 2005).

headed with exercise, as well as fatigued and not working on her artwork much. She met with several specialists to try to determine the cause of her symptoms (not all of these treatment notes are in the record). Nevertheless, she was able to start a part-time job in fall 2022, including two forty-hour work weeks for initial training (she did report resulting increased pain from sitting, but she was able to make it through). Chiropractic treatment from September to November 2022 reduced her pain from a 7 to a 4 out of 10 on the pain scale. In 2023, Plaintiff sought limited treatment (from her primary care provider and cancer follow-up appointments), and although she complained of pain to social services providers, it was manageable enough for her to work and perform activities of daily living. She underwent physical therapy from June to September 2023, with improvement slow-going, although she did state physical therapy along with neurofeedback treatment helped her pain.

Substantial evidence supports the ALJ's conclusion that Plaintiff's treatment was "conservative and routine." Plaintiff's fibromyalgia medications were rarely adjusted, and she tried no new fibromyalgia medications since the onset date (she did inquire about naltrexone in May 2023). She participated in physical therapy and chiropractic treatment on several occasions, but the ALJ acknowledged this treatment. Plaintiff argues that the ALJ ignored her breast cancer treatment, which included surgery and chemotherapy (and was not "conservative and routine"). But the ALJ discussed this evidence and acknowledged Plaintiff's initial reports of increased fibromyalgia pain as a result of chemotherapy and tamoxifen. AR 20. Overall, however, substantial evidence supports that Plaintiff's fatigue and other symptoms improved so that she was not as limited as she had been while undergoing breast cancer treatment. Plaintiff suggests that the ALJ somehow failed to follow the Appeals Council's remand order, but the ALJ adequately considered her cancer history and how it impacted her symptoms. Perhaps most importantly, Plaintiff's complaints of pain and limitations reflected in the treatment and

social services records are inconsistent with the pain and limitations she reported to the Social Security Administration in function reports and her hearing testimony.[25]

Given the deferential substantial-evidence standard of review, I recommend affirming the ALJ's decision not to fully credit Plaintiff's subjective complaints of her limitations.

## III.   CONCLUSION

I recommend **affirming** the Commissioner's decision and entering judgment in favor of the Commissioner.

Objections to this Report and Recommendation must be filed within fourteen days of service in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b).  Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.[26]  Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein.[27]

**DATED** September 4, 2025.

Kelly K.E. Mahoney
Chief Magistrate Judge
Northern District of Iowa

---

[25] The ALJ did not mention this, but there is also evidence that Plaintiff saw her cancer diagnosis as a chance to obtain disability benefits and have time to work on her art and that she purposefully sought to keep her earnings below the Social Security Administration's substantial gainful activity threshold.

[26] **Fed. R. Civ. P. 72**.

[27] *See United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

21